**WESTINGHOUSE HANFORD COMPANY, Plaintiff–Appellee,**

v.

**HANFORD ATOMIC METAL TRADES COUNCIL, Defendant–Appellant.**

No. 90–35208.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 8, 1990.

Decided July 31, 1991.

Alex J. Skalbania, Critchlow, Williams & Schuster, Richland, Wash., for defendant-appellant.

Larry E. Halverson, Davis, Wright & Jones, Bellevue, Wash., for plaintiff-appellee.

Before FLETCHER, FARRIS and BOOCHEVER, Circuit Judges.

FLETCHER, Circuit Judge:

Defendant Hanford Atomic Metal Trades Council ("the Union") appeals from the district court's grant of summary judgment in favor of plaintiff Westinghouse Hanford Company ("Westinghouse") on Westinghouse's action to stay arbitration and the Union's counterclaim to compel arbitration. We reverse and remand for the district court to enter an order compelling arbitration.

## FACTS

The Union represents several thousand workers at the Hanford Nuclear Reservation ("Hanford") near Richland, Washington. The United States Department of Energy ("DOE") is responsible for operating and maintaining Hanford, and it delegates those responsibilities to several private contractors. Defendant Westinghouse, DOE's Operations and Engineering Contractor, has primary responsibility for the day-to-day operation and maintenance of Hanford. Kaiser Engineers Hanford ("Kaiser") is DOE's Engineer/Constructor Contractor.

Pursuant to DOE regulations and its contracts with Westinghouse and Kaiser, DOE assigns Kaiser all work covered by the Davis–Bacon Act, 40 U.S.C. §§ 276a to 276a–5 (1988). That work includes "every contract in excess of $2,000 ... for construction, alteration, and/or repair, including painting and decorating, of public buildings or public works." *Id.* § 276a. "[P]ainting which is closely integrated within operation and maintenance activities" is not Davis–Bacon work. 48 C.F.R. § 922.471(f) (1990). DOE assigns all Hanford projects not involving Davis–Bacon work to Westinghouse. As DOE's primary contractor, Westinghouse makes the initial recommendation as to whether a proposed project involves Davis–Bacon work. DOE's Richland Labor Standards Board, informally known as the Davis–Bacon Committee, then makes the final determination, based on regulatory criteria. *See* 48 C.F.R. §§ 922.470, 922.471, 970.2273 (1990).

In August of 1988, DOE determined that the Yakima River Railroad Bridge, which is located near Richland and falls within DOE's jurisdiction over Hanford, needed repainting. DOE notified Westinghouse of the proposed project and asked for its recommendation as to whether the project came within the Davis–Bacon Act. The Westinghouse engineer responsible for making the recommendation determined that the project was Davis–Bacon work, primarily because the painting of the bridge was not part of a periodic or cyclic maintenance program. The engineer also requested that the bridge be put on a cyclic maintenance program. DOE's Davis–Bacon Committee agreed with the engineer's recommendation and issued a final determination to that effect, assigning the project to Kaiser. DOE eventually also granted the engineer's request that the bridge be put on a cyclic program, so that future painting and maintenance of the bridge can be performed by Westinghouse and the members of the Union.

The dispute at issue in this case arose when two members of the Union employed by Westinghouse, painters Ed Hill and Ed Lamm, noticed that Kaiser employees were painting the bridge. On October 12, 1988, Hill and Lamm filed Grievance Number 88–465, asserting that the painting of the bridge should have been assigned to Westinghouse and seeking damages for lost wages. The grievance states in full:

> Westinghouse painters are grieved that Westinghouse Management contracted out work (painting Yakima River R.R. Bridge) to [Kaiser]. this [sic] is maintenance work as the bridge has been painted several times in the past (last time 1981–82).

> Local 1789 Painters are asking for damages in lost wages in the amount of $200,000.00 or the amount paid to [Kaiser].

> Painters are also asking Westinghouse to not give any more maintenance work to [Kaiser] in the future.

The Union pursued the grievance through the normal grievance procedures established in the collective bargaining agreement between Westinghouse and the Union ("the Agreement"), but the parties failed to

achieve a mutually satisfactory resolution of the dispute.

Having exhausted the grievance procedures, the Union notified Westinghouse that it intended to proceed to final arbitration as the Agreement provided. The parties selected a neutral arbitrator, Ms. Leslie Sorenson–Jolink, and scheduled a hearing for October 6, 1989. The day before the hearing, Westinghouse informed the Union for the first time of its belief that the grievance was not arbitrable. The parties continued the hearing to October 17 while they discussed settlement. On October 16, again one day before the scheduled arbitration hearing, Westinghouse filed a complaint in federal district court pursuant to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1988). Sorenson–Jolink continued the arbitration hearing pending the resolution of the judicial action.

Westinghouse's complaint alleged that the dispute was not subject to arbitration because DOE, not Westinghouse, had contracted out the project to Kaiser, and DOE was not party to the Agreement. Westinghouse sought a stay of the arbitration, a determination that the grievance was not arbitrable, and a declaratory judgment that the Union was not entitled to damages for lost work. The Union counterclaimed, seeking an order compelling arbitration and an award of attorney's fees for having to defend Westinghouse's action. Both sides filed motions for summary judgment.

On February 9, 1990, the district court issued its ruling on Westinghouse's motion for a stay of the arbitration and both parties' motions for summary judgment. The court held that the dispute was not arbitrable, that the court lacked subject matter jurisdiction to enter the declaratory judgment sought by Westinghouse, and that the Union was not entitled to attorney's fees. The Union filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1988).

## DISCUSSION

■ We review the district court's order granting summary judgment de novo. *Teamsters Union Local 287 v. Frito–Lay, Inc.*, 849 F.2d 1210, 1211 (9th Cir.1988). The central issue in this case, the arbitrability of a dispute under a collective bargaining agreement, is a question of contract interpretation that we review de novo. *McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 16*, 859 F.2d 1382, 1385 (9th Cir.1988).

■ "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)). The threshold question of arbitrability—which is no less than the question of the arbitrator's jurisdiction to decide disputes—is thus a question for judicial resolution. *AT & T*, 475 U.S. at 649, 106 S.Ct. at 1418. If arbitrators were permitted to define their own jurisdiction, employers and unions would lose the power to determine which disputes they would like to have arbitrated. Having lost that power, they would become reluctant to incorporate arbitration provisions in their collective bargaining agreements. As the Court emphasized in *AT & T*, such a result would "undercut[ ] the longstanding federal policy of promoting industrial harmony through the use of collective-bargaining agreements." 475 U.S. at 651, 106 S.Ct. at 1419. These are the rationales underlying the rule that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649, 106 S.Ct. at 1418.

■ Of course, this rule is subject to an important caveat. In considering whether the Union's grievance is arbitrable, we must carefully avoid ruling on the merits of that grievance. *Id.* The Court has expressed this caveat in strong terms. In *AT & T*, the Court warned:

Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. *Id.* at 649–50, 106 S.Ct. at 1419. In other words, that a grievance might be considered by the court to be "frivolous" is not a proper ground for holding that it is not arbitrable. The Court made this clear thirty years ago in the Steelworkers Trilogy:

> The courts … have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware.

*United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960) (footnotes omitted).

■ To effectuate this policy, the Supreme Court has "established that where the contract contains an arbitration clause, there is a presumption of arbitrability." *AT & T*, 475 U.S. at 650, 106 S.Ct. at 1419. This presumption carries particular force where the arbitration clause is phrased in broad and general terms. *Id.* The presumption that a grievance raised under a collective bargaining agreement is arbitrable "recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements." *AT & T*, 475 U.S. at 650, 106 S.Ct. at 1419. As the Court has explained, "the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government." *Warrior & Gulf*, 363 U.S. at 581, 80 S.Ct. at 1352. "The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." *Id.* The presumption of arbitrability keeps the judiciary's interference in that machinery to a minimum and thereby preserves the integrity of industrial self-government.

Bearing in mind the presumption of arbitrability, and taking care to avoid considering the merits of the Union's grievance, we now consider whether the grievance is arbitrable under the Agreement. The relevant portion of the arbitration clause, Article XIX, provides for arbitration of "[a]ny grievance which remains unsettled after having been fully processed pursuant to the provisions of Article XVIII Grievance Procedure, and which involved … [t]he interpretation or application of a provision of this Agreement." Article XIX thus establishes two prerequisites to arbitration that are relevant in this case: the grievance procedures of Article XVIII must have been exhausted, and the grievance must involve "interpretation or application of a provision" in the Agreement. The district court, stating that it could not "find a single provision which is in any way applicable to the matter in dispute," Order of Dismissal at 6, held that the Union's grievance was not arbitrable because the second prerequisite had not been met. Westinghouse claims on appeal that the Union has established neither of the two prerequisites. First, Westinghouse argues that the Union is asserting a new grievance on appeal and thus has not exhausted the grievance procedures of Article XVIII. Second, it argues that the district court was correct in finding nothing in the Agreement even remotely applicable to the grievance. We address each argument in turn.

### I. Exhaustion of Grievance Procedures

■ In their grievance, Union members Hill and Lamm complained that Westinghouse had "contracted out" the bridge-painting work to Kaiser. Both parties acknowledge that in fact it was DOE that assigned the work to Kaiser. The Union contends that the grievance, despite any misunderstanding Hill and Lamm may have had about the contractual relations among

the parties, relates not to DOE's Davis–Bacon determination but to Westinghouse's role in recommending to DOE that the painting of the bridge be considered Davis–Bacon work. According to Westinghouse, the Union's contention represents an attempt to reframe the grievance on appeal so as to make it a new and different grievance—one for which the Union has not exhausted the grievance procedures of Article XVIII.

Westinghouse correctly notes that the grievance does not accurately reflect Westinghouse's role in the process through which Davis–Bacon determinations are made. The grievance rests on the erroneous premise that it was Westinghouse, and not DOE, that "contracted out" the work to Kaiser. However, Westinghouse ignores that the drafters of the grievance were painters. While it might be appropriate to expect lawyers to understand and express in a written grievance the finer points of the parties' relationships, it is unrealistic to hold Hill and Lamm to the same standard. When read in light of the actual procedures for Davis–Bacon recommendations and determinations, the grievance is readily understood as a complaint about Westinghouse's role in those procedures.[1] We decline to send the Union back to the starting line merely because the painters' draftsmanship was less than artful.

We also reject Westinghouse's contention that the Union is presenting on appeal "a different grievance than the one ... the District Court considered." Brief of Appellee at 1–2. The Union argues that the grievance is arbitrable because it involves "interpretation or application" of Supplementary Agreement No. 6 to the Agreement ("Supplement 6"), which sets out principles concerning work that is contracted out. There is no question that the Union directed the district court's attention to Supplement 6. The Union's counterclaim refers to it. The Union also discussed Supplement 6 in its memorandum in support of its motion for summary judgment. We

hold that the Union has satisfied the exhaustion requirement.

## II. "Interpretation or Application" of the Agreement

The second prerequisite to arbitration requires that the grievance involve "interpretation or application of a provision of [the] Agreement." The Union draws our attention to Supplement 6, the relevant portion of which reads:

> Westinghouse Hanford Company confirms its intent to maintain a work force consistent with scheduled requirements, and under those conditions, to make every effort, consistent with our prime contract with the DOE and other legal requirements, to provide regular employment for its bargaining unit employees before work is contracted outside; to the extent our prime contract provides that services are to be provided to Westinghouse Hanford Company by another contractor, the work must be contracted out. . . .

The Union contends that the grievance is arbitrable because it involves "interpretation or application" of Supplement 6. Westinghouse disagrees.

Because of the presumption in favor of arbitrability, Westinghouse bears the burden of proving that the parties did not intend to arbitrate the grievance. The grievance is arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1353. Where there is no "express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.* at 585, 80 S.Ct. at 1354. *See also AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419 (quoting same). Thus, we first examine the Agreement itself—particularly the arbitration clause and Supplement 6—for any provi-

---

**1.** Westinghouse also asserts that the parties did not address this understanding of the grievance during the grievance-resolving process. Because the record before us is incomplete and vague concerning what transpired at the various steps of that process, we are unable to assess the truth of this assertion.

sion excluding the grievance from arbitration.

Nothing in Article XIX indicates an intent to exclude from arbitration any particular grievance or type of grievance. Article XIX is a general arbitration clause, containing the two prerequisites already identified but nothing more in the way of relevant conditions or exclusions. Nor does Supplement 6, itself, contain any language excluding from arbitration grievances that involve its "interpretation or application." Finally, Westinghouse has not directed us to any other provision of the Agreement that purports to exclude the grievance from arbitration.

Unable to rely on any explicit exclusions from arbitration, Westinghouse contends that the grievance is not arbitrable because Supplement 6 simply does not *apply* to its Davis–Bacon recommendations. Focusing on the final clause of the portion of Supplement 6 quoted above, Westinghouse argues that its "make every effort" obligation applies only to work it subcontracts to another party, not work that DOE contracts out to another party. However, the prior clause—the clause that actually states Westinghouse's obligation—applies to work that "is contracted outside." The use of the passive verb form permits the interpretation proffered by the Union that Supplement 6 applies to Westinghouse's role in Davis–Bacon determinations. The question of whose reading is correct requires "interpretation" of Supplement 6. To the extent that Westinghouse is asking us to adopt its reading, it is seeking a court determination of the merits of the grievance. Consistent with our duty to avoid ruling on the merits, we cannot provide what Westinghouse requests. "Interpretation of substantive provisions must be left to the arbitrator in the first instance." *Warehousemen's Union Local No. 206 v. Continental Can Co.*, 821 F.2d 1348, 1352 (9th Cir.1987) (quoting *Laborers Int'l Union Local 252 v. Town Concrete Pipe of Wash., Inc.*, 680 F.2d 1284, 1285 (9th Cir.), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 453, 74 L.Ed.2d 606 (1982)).

Westinghouse contends that we can interpret Supplement 6 for the limited purpose of determining whether the grievance is arbitrable without contravening the proscription against ruling on the merits. In support, Westinghouse relies on *AT & T*, in which the Court examined several provisions in a collective bargaining agreement in order to determine whether a grievance challenging layoffs was arbitrable. Our case differs markedly from *AT & T*. The arbitration clause at issue in *AT & T* contained an explicit exclusion for disputes "excluded from arbitration by other provisions of this contract." *AT & T*, 475 U.S. at 645 n. 1, 106 S.Ct. at 1416 n. 1. One of those "other provisions" recognized AT & T's right to exercise management functions (including termination of employment), and explicitly made that right "not subject to the provisions of the arbitration clause." *Id.* at 645 n. 2, 106 S.Ct. at 1416 n. 2. The Court thus was faced with an arbitration clause that excluded some disputes from arbitration, plus a provision evidently embodying one such exclusion. The Seventh Circuit had refused to interpret these provisions, instead referring the question of arbitrability to the arbitrator. The Court, finding that AT & T might have been able to identify an express exclusion or present other forceful evidence about why the union's grievance was not subject to arbitration, quite properly reversed. It is worth emphasizing that the Court did not find the dispute non-arbitrable; it simply remanded for a judicial determination of the question of arbitrability.

In *AT & T* it was appropriate, indeed necessary, for the district court to look to evidence outside the arbitration clause in order to determine whether the grievance was one that was *excluded* from arbitration by the terms of the arbitration clause. It is neither necessary nor appropriate for us to look to externalities. The Agreement's arbitration clause is general. Article XIX contains no exclusions, and Supplement 6 contains no language excluding its interpretation from the province of arbitration.

One of the Steelworkers Trilogy, *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), is the most helpful precedent

for our case. In it, a union sought arbitration of a grievance filed by an employee who had left his job due to an injury and subsequently was refused reinstatement by his employer. The Court had before it a general arbitration clause much like Article XIX. The clause provided for arbitration of "[a]ny ... grievances arising between the parties as to the meaning, interpretation and application of the provisions of this agreement, which are not adjusted as herein provided." 363 U.S. at 565 n. 1, 80 S.Ct. at 1345 n. 1. The Court explained that a court facing a broad arbitration clause has a limited role:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator.

*Id.* at 567–68, 80 S.Ct. at 1346. The Court ordered arbitration, leaving the merits of the dispute for the arbitrator to decide.

In his concurring opinion in the Steelworkers Trilogy, Justice Brennan, joined by Justice Harlan, further explained why courts faced with a general arbitration clause should not become involved in interpreting substantive provisions of a collective bargaining agreement. Referring to *American Manufacturing* and *Warrior & Gulf,* Justice Brennan wrote:

> In each of these two cases the issue concerns the enforcement of but one promise—the promise to arbitrate in the context of an agreement dealing with a particular subject matter, the industrial relations between employers and employees. Other promises contained in the collective bargaining agreements are beside the point unless, by the very terms of the arbitration promise, they are made relevant to its interpretation.... [T]he arbitral process in collective bargaining presupposes that the parties wanted the informed judgment of an arbitrator, precisely for the reason that judges cannot provide it. Therefore, a court asked to

enforce a promise to arbitrate should ordinarily refrain from involving itself in the interpretation of the substantive provisions of the contract.

*Id.* at 569–70, 80 S.Ct. at 1364. Turning specifically to the standard, general arbitration provision at issue in *American Manufacturing,* Justice Brennan noted with approval the majority's view that the provision simply means "that the parties have agreed to arbitrate any dispute which the moving party asserts to involve construction of the substantive provisions of the contract, because such a dispute necessarily does involve such a construction." *Id.* at 571, 80 S.Ct. at 1365. The meaning of Article XIX is no different.

*American Manufacturing* instructs that it is not our role to determine whether Supplement 6 supports the Union's claim. It is, rather, the job of Sorenson–Jolink, the arbitrator mutually chosen by the parties, to arbitrate grievances that involve "interpretation or application" of Supplement 6. This is not to say that courts always must disregard the substantive provisions of a contract containing an arbitration clause. In fulfilling its duty to decide whether the parties have agreed to submit a dispute to arbitration, the court should examine the arbitration clause to see whether it excludes the grievance from its purview and any relevant substantive provisions to see whether they contain exceptions to arbitration. Thus in *AT & T,* the Court examined substantive provisions of the collective bargaining agreement for the limited purpose of identifying exclusions from arbitration. The same situation was presented in *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

*Warrior & Gulf* involved an arbitration clause excluding "matters which are strictly a function of management" from arbitration, and the Court accordingly widened the scope of its inquiry in order to give content to the meaning of that exclusion. The Court had to look beyond the arbitration clause in order to determine whether certain layoffs were "strictly a function of management." Nevertheless, at the same

time that it widened the scope of its inquiry, the Court reiterated the warning that a court faced with a dispute over arbitrability "should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." 363 U.S. at 585, 80 S.Ct. at 1354. It also bears noting that in *Warrior & Gulf* the Court found the dispute to be arbitrable.

Our own cases similarly recognize that the court should not look to substantive provisions of a collective bargaining agreement except insofar as it is necessary to consider exclusions to an arbitration clause. For example, in *Teamsters Union Local 287 v. Frito–Lay, Inc.*, 849 F.2d 1210 (9th Cir.1988), the union sought to arbitrate a grievance concerning the employer's transfer of work from one of its plants to another. The collective bargaining agreement contained a somewhat ambiguous arbitration clause and a provision making "management rights" not subject to arbitration. We reversed the district court's ruling that the arbitration clause was not mandatory, and remanded for the court to consider whether the grievance was arbitrable. Noting the danger that the district court would be coming "uncomfortably close to a decision on the merits" as it examined the management rights provision, we constrained the district court's inquiry, emphasizing that it "need not even consider which party's interpretation of the contract is correct." 849 F.2d at 1213. Thus, in *Frito–Lay*, as in *AT & T* and *Warrior & Gulf*, it was proper for the court to look beyond the arbitration clause to a substantive provision of the agreement, but only because the latter contained an express exclusion from arbitration. *See also Contra Costa Legal Assistance Workers v. Contra Costa Legal Services Found.*, 878 F.2d 329, 330 (9th Cir.1989) (per curiam) (finding layoff grievance nonarbitrable based on express exclusion in arbitration clause); *Teamsters Local 315 v. Union Oil Co. of Cal.*, 856 F.2d 1307, 1310–13 (9th Cir.1988) (recognizing need

for broader examination of substantive provisions where arbitration clause is restrictive rather than broad and general like that in *American Manufacturing*), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989).

In contrast, where there are no such exclusions from arbitration, we have limited our inquiry to the arbitration clause itself and refused to consider substantive provisions. For example, in *Building Materials and Construction Teamsters Local No. 216 v. Granite Rock Co.*, 851 F.2d 1190 (9th Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988), we considered the arbitrability of a union's grievance that the employer had shifted work to a subsidiary without applying certain provisions of their collective bargaining agreement to the subsidiary's employees. On appeal from an adverse ruling by the district court, the employer argued that the court had erred by failing "to determine whether the union's claim rested on a 'plausible' reading of the agreement." 851 F.2d at 1194. We rejected the argument—even though the union was relying on an *implied* contractual clause—because of the agreement's broad arbitration clause, which encompassed "[a]ll disputes arising under this agreement." *Id.* In holding that the grievance was arbitrable, we specifically relied on *American Manufacturing* and *AT & T*, stressed the limited function of a court faced with a broad arbitration provision, and carefully avoided making any judgment about the plausibility or merit of the union's claim. *See also Warehousemen's Union Local No. 206 v. Continental Can Co.*, 821 F.2d 1348, 1352 (9th Cir.1987) (finding dispute arbitrable based solely on language in arbitration clause and explicitly disclaiming any reliance or judgment about "substantive contract clauses that go to the merits of the dispute").

In accordance with *AT & T*, the Steelworkers Trilogy, and our own case law, we decline to make any judgment about whose interpretation of Supplement 6 is better. That is the very question that must be answered to resolve the merits of the dispute between the parties. As the griev-

ance clearly involves "interpretation or application" of Supplement 6, it is subject to arbitration under Article XIX.

■ Westinghouse makes one final attempt to present "forceful evidence" that the parties did not intend to arbitrate the grievance. Westinghouse argues that DOE's Davis–Bacon determination is governed by federal administrative regulations and cannot be questioned by an arbitrator. DOE, appearing as *amicus curiae*, joins this argument, suggesting that not even the federal courts can second-guess an agency's Davis–Bacon determination. *See Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981) (refusing to recognize implied private right of action for employee to challenge agency's Davis–Bacon determination). In support of their argument, Westinghouse and DOE rely on *Oil, Chemical & Atomic Workers Int'l Union, Local 20652 v. EG & G Idaho, Inc.*, 769 P.2d 548, 115 Idaho 671 (1989), in which the Idaho Supreme Court held that challenges to Davis–Bacon determinations are not subject to arbitration because only DOE—and not the parties to the collective bargaining agreement—has the authority to make such determinations. The Idaho court emphasized not only DOE's exclusive and final authority over Davis–Bacon determinations, but also the danger that arbitral review of such determinations "would undermine the administrative review process provided in federal law." 769 P.2d at 552 (citing *Coutu*, 450 U.S. at 760, 101 S.Ct. at 1456).

We agree with Westinghouse, DOE, and the Idaho Supreme Court that the arbitrator cannot question DOE's final determination that the painting of the bridge constituted Davis–Bacon work. However, it does not follow that the grievance cannot be arbitrated. The grievance is directed at *Westinghouse's* obligations under Supplement 6—the duty "to make every effort, consistent with [its] prime contract with the DOE and other legal requirements, to provide regular employment for its bargaining unit employees before work is contracted outside." The arbitrator need not

second-guess DOE's determination in order to decide Westinghouse's obligations.

In the very case upon which Westinghouse relies, *EG & G*, the Idaho Supreme Court recognized this distinction between the arbitrability of a Davis–Bacon determination by DOE and the arbitrability of an employer's obligation to a union vis-a-vis its role in making Davis–Bacon recommendations. While emphasizing that the arbitrator could not alter the DOE determination, the court refused to prevent arbitration altogether. The court stated:

> Because DOE's Davis–Bacon determinations affect both EG & G and the Union similarly, and because only EG & G officially participates in the decision-making process, it is arguably EG & G's duty to its union employees to use its best efforts to get favorable Davis–Bacon determinations.

*EG & G*, 769 P.2d at 552. The agreement in *EG & G* provided that where DOE orders prevailed over any provision of the agreement, the parties would meet "to negotiate a mutually satisfactory substitute for the contract clause or practice involved," and would submit the issue to arbitration if unable to reach agreement on a substitute. *Id.* at 550. Based on this rather vague provision, the court "remand[ed] for arbitration in this area of EG & G's contractual duty to use best efforts to influence DOE rulings even though the arbitrator would have no authority to alter those rulings." *Id.* at 552.

Westinghouse contends, correctly, that the Agreement in the present case does not contain the same language relied upon by the Idaho Supreme Court. However, the Union is relying on Supplement 6, which is no less supportive of the Union's position in this case than was the vague provision at issue in *EG & G*. Under one construction of Supplement 6, Westinghouse is at least obligated to afford the Union an opportunity to present arguments about why certain work should not be considered to come under the Davis–Bacon Act before Westinghouse submits its recommendation to DOE. Whether this construction of Supplement 6 is appropriate and whether West-

inghouse has met its obligations under this construction are questions involving "interpretation or application" of a provision of the Agreement within the meaning of Article XIX. As these questions are for the arbitrator to answer, we express no opinion on them or on the question of what remedy, if any, would be appropriate should the arbitrator conclude that Westinghouse failed to meet its obligations.

We do not share the concern expressed by Westinghouse and DOE that arbitration limited to Westinghouse's obligations inevitably will blur into arbitration of DOE's Davis–Bacon determinations. The very language of Supplement 6, which subjects Westinghouse's obligations to its "contract with the DOE and other legal requirements," precludes the arbitrator from imposing or enforcing any obligation on Westinghouse that would violate either its contractual duties to DOE or any other applicable law, including the Davis–Bacon Act and the regulations promulgated under it. We perceive no danger that the arbitrator will require Westinghouse to distort or slant its Davis–Bacon recommendations in favor of the Union in a way that will "deprive the government of the objective, unbiased input it needs from its contractor to make proper Davis–Bacon determinations." Brief of *Amicus Curiae* at 9–10.

Westinghouse has failed either to identify an express exclusion to arbitration or to present "other forceful evidence" of the parties' intent to exclude the grievance from Article XIX's broad coverage. Westinghouse's central argument—that Supplement 6 simply does not apply to the grievance—necessarily calls upon us to weigh the relative merits of the parties' differing interpretations of that provision. The well-established principle that courts must steer clear of the merits in cases involving arbitrability mandates that we reject that calling.

### III. Attorney's Fees and Costs

■ The Union sought attorney's fees in the district court on the ground that Westinghouse had refused to submit to arbitration in bad faith or on frivolous grounds, *see United Food & Commercial Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1383 (9th Cir.1984), and now appeals the district court's denial of its request. Westinghouse seeks double costs and attorney's fees for what it characterized as the Union's frivolous appeal. *See* Fed.R.App.P. 38. We decline to award fees or costs to either party. The Union's only evidence that Westinghouse acted in bad faith is that it first disputed the arbitrability of the grievance the day before the scheduled arbitration hearing and filed its complaint the day before the rescheduled hearing. This evidence is insufficient to demonstrate bad faith. Since neither Westinghouse's suit nor the Union's appeal can be deemed frivolous, each party shall bear its own costs.

### CONCLUSION

This is not a case about who wins and who loses the dispute over the grievance. It is, rather, a case about who should decide the question. The arbitrator might decide that Supplement 6 does not apply to the grievance; she may even conclude that the Union's claim that it does apply is frivolous. Alternatively, she may find that Supplement 6 does apply to the grievance, but even then it is unclear what the final conclusion of the arbitration will be. She might conclude that Westinghouse was bound, by its contract with DOE or by other legal requirements, to conduct the recommendation process exactly as it did. She might decide that Westinghouse was obligated to provide advance notice to the Union that it would be making a Davis–Bacon recommendation about painting the bridge. She might conclude that Westinghouse satisfied any obligations it had under Supplement 6 by requesting to DOE that in the future the bridge be put on a regular maintenance schedule for cyclical painting. Conversely, she might decide that Westinghouse was remiss in not making that request sooner. We take pains to express no view on these or any other possible determinations precisely because to do so would be to usurp the role of the arbitrator, whose "institutional competence ... in in-

terpreting collective-bargaining agreements" exceeds our own. *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419.

We REVERSE and REMAND to the district court so that it may enter an order compelling arbitration.